## SOLON HUMPHREYS *et al.*

*v.*

## JOHN ALLEN, Receiver, *et al.*

*Filed at Ottawa January 18, 1882.*

RECEIVER'S CERTIFICATES—*for indebtedness of railroad—made a first lien as against prior mortgage—time to question power of court.* If the holder of railroad bonds secured by trust deeds on the road, having notice of the appointment of a receiver, and an order of court directing him on his petition to issue certificates of indebtedness on which to raise money to discharge a chattel mortgage on the personal property of the company, and to pay taxes, current expenses, etc., and making such certificates a prior and first lien on all the property of the company, desires to question the power of the court to make such order, he must do so before such certificates are issued and sold to *bona fide* purchasers, or paid out to creditors of the company. After their issue and sale, it will be too late for him, or purchasers from him with notice of the facts, to raise the question whether the subject matter to which the certificates were applied was within the scope of the power of the court in the preservation of the property for the benefit of all concerned.

APPEAL from the Appellate Court for the Second District;— heard in that court on appeal from the Circuit Court of Peoria county; the HON. DAVID McCULLOCH, Judge, presiding.

On May 21, 1864, the Peoria, Pekin and Jacksonville Railroad Company executed its 1200 coupon bonds, payable to Francis Cooley, or bearer, of which 800 were each for $1000 principal, and 400 were each for $500 principal, and they all bore interest, payable annually, at the rate of seven per cent per annum, after January 1, 1865, and the principal was payable July 1, 1894. These bonds were numbered consecutively, from 1 to 1200. To secure the payment of these bonds, this company, on the same day, executed a deed conveying to Francis Cooley and James Buell, as trustees, all the real and personal property of the company, then acquired or thereafter to be acquired. By a clause in the bonds, default in the payment of any part of any installment of

interest for six months after demand therefor, was to render the whole of such bonds due and payable at once; and by a clause in the deed, after a lapse of six months after such default the trustees were authorized to take possession under the mortgage, upon the written request of any two or more of the holders of such bonds, and sell the property, etc. The company failed to pay a part of the interest due July 1, 1871, and also made default in payment of large sums of interest falling due thereafter. After the making of these bonds and this mortgage, the company made an issue of a series of second mortgage bonds.

At the February term of that court, for the year 1878, John Allen and John H. Allen, holders and owners of a large number of both first and second mortgage bonds, filed a bill in the circuit court of Peoria county, alleging demand of interest past due, default of payment thereof, and the insolvency of the company; alleging that the principal of all the bonds had become due, and asking foreclosure, and for the appointment of a receiver to take charge of the property and manage and operate the same. At that term John Allen was appointed such receiver, and entered immediately upon his duties as such.

Afterwards, at the May term, 1878, on the petition of Allen, as such receiver, an order of court was made and entered of record, reciting, in substance, that at the time of the appointment of such receiver the railroad company had become, and was, indebted for services, supplies, rentals (incurred within the preceding six months), and for unpaid taxes, $67,831.51; and that the company was also indebted on March 4, 1878, to various persons, in the sum of $81,600, which had been borrowed and expended in repairs and improvements of the road, and for the protection of the credit of the company, and being so indebted, executed to William W. Booraem, as trustee for such persons, a chattel mortgage upon certain of its engines and rolling stock, acquired by the

company after the adoption of the constitution of 1870, and declaring the indebtedness for services, supplies, repairs and rentals a first lien upon the property of the railroad company; and declaring the chattel mortgage a valid lien upon the engines and rolling stock therein mentioned; and finding that it would be for the best interests of the railroad company, and for the preservation of its property and the saving of interest on the chattel mortgage, that the receiver should be authorized to raise money on certificates to be issued by him, and ordering, in substance, that the receiver be authorized to borrow money sufficient to pay all of such indebtedness, and to issue to the parties from whom he may borrow, receiver's certificates, bearing interest; and for the payment of such certificates he may use any part of the receipts or current revenue of the road which may be in his hands, in excess of current expenses; and further ordering, that the certificates issued to provide for the indebtedness for supplies, services, etc., shall be designated on their face as class "A," and that those issued to provide for the payment of the debt secured by the chattel mortgage shall be designated on their face as class "B." And it was further ordered, that all certificates so issued should be a valid and *first* lien upon all the property, real, personal and mixed, of such railroad company, and that the receiver report to the court the persons to whom such certificates may be issued, and on what account, the amount, time of payment, and rate of interest.

When this order was made, the railroad company and the trustees in the first and second mortgages were parties to the proceeding, and the trustees expressly consented to the order; but Mr. Constable was not a party, nor was Humphreys, Jessup, Terry or Field, nor bondholders other than the Allens, parties to the record at that time. The record, however, does show that Mr. Constable, who at that time was the holder, for himself or others, of the bonds now owned by Humphreys, Jessup, Terry and Field, was a director of the railroad com-

pany, and was aware that the making of the chattel mortgage had been authorized by the board of directors, and of the fact that the same had been executed. The record also shows that he was present at a meeting of the board of directors on June 11, 1878, where it was reported to the board that the road had been placed in the custody of the receiver, and that an order had been made for the issue of receiver's certificates for the purposes named, and which it was ordered should be a first lien, as above stated.

During the summer of 1878, the receiver issued certificates of class "A" to the amount of $67,483.65. Before the 1st of March, 1879, he issued also certificates of the class "B" to the amount of $79,497.08, and the issuing of all of them was duly reported to the court. Of these certificates, Elizabeth Bayard held of class "A" to the amount of $50,000 (numbers 7 to 16 inclusive), and of class "B" to the amount of $25,000, (numbers 1 to 5 inclusive, and numbers 17 and 18); and William Oathout of class "A" held certificate number 6, amount $5000, purchased in good faith for value, without notice of any defect or vice in them. The other certificates were given either for money borrowed or in satisfaction of debts which the receiver had been ordered by the court to pay, and those receiving such certificates surrendered the securities held by them for such debts. All this was known to Mr. Constable, who was a holder of a large amount of the bonds secured by the mortgages. He did not intervene in the litigation, or in any manner object to what he knew was being done.

On the 10th of May, 1879, James M. Constable sold to Solon Humphreys, Morris K. Jessup, John P. Terry and Cyrus W. Field, first mortgage bonds to the amount of $692,000, with all outstanding coupons, and also second mortgage bonds of the company to the amount of $664,000, with all outstanding coupons thereto attached; also, preferred stock of the company to the amount of $164,400; also, common

stock of the company to the amount of $604,700. The price at which this purchase was made was $380,600. Ten per cent of the same was paid in cash; ten per cent of the same was to be paid in November, 1879; twenty per cent in May, 1880; thirty per cent in May, 1881, and thirty per cent in May, 1882, with interest at the rate of six per cent per annum, payable semi-annually. By their agreement the bonds and stock were to be held by the Central Trust Company of New York, as collateral security for the payment of the purchase money, the buyers having the option to pay the same, with accrued interest, at any time within three years. It is recited in this agreement, that it was understood "that General Wager Swayne is to proceed, under the instructions of said Field, Jessup, Terry and Humphreys, to take such legal measures as may be requisite to foreclose the road, and also to change the receiver at any time, all costs and expenses of such proceedings to be borne by Jessup, Field, Terry and Humphreys, and also the expense of the trust."

On June 14, 1879, Francis B. Cooley and James Buell filed their cross-bill in the cause, setting up that they were trustees under the first mortgage, and charging that all the principal sums in the bonds had become due by default of payment of interest, and praying a foreclosure of the first mortgage.

On July 14, 1879, Humphreys, Jessup, Terry and Field having intervened and been made parties, were admitted in the chancery cause as co-complainants with the Allens, in which they set up their ownership of the bonds which they purchased from Constable, and charge that the receiver's certificates were improvidently authorized to be issued, and insisting that they ought not to be held a lien prior to their rights as holders of the mortgage bonds.

On the 7th of August, 1879, a decree of foreclosure was rendered, finding the whole amount of the principal of the first mortgage bonds to be due and payable, and that there

was due and unpaid at that time, of interest specified in the coupons, $417,278.87, and that there was also due at that date, $89,764.19 of interest accrued upon overdue coupons; the whole amount found due was $1,507,043.06. The decree ordered the road to be sold subject to taxes legally due, and to all just claims for right of way, and to certain prior mortgages on small portions of the real estate, and directed the master, after making the sale, to pay certain expenses, the compensation of the trustees, and thirdly, "all such indebtedness contracted, or to be contracted, by the receiver, as may not be excepted to, at or before the confirmation of said sale," and further directed that all the residue of the money arising from the sale shall be brought into court, subject to further order. The decree further provided, that the rights of all of the holders of the bonds and coupons, and of other persons having an interest in the fund, be reserved for subsequent determination; and that all such persons have the same rights against the fund arising from the sale that they would against the property sold prior. The master, under this decree, sold the railroad and property of the company, and Solon Humphreys became the purchaser for the sum of $950,000. In the decree of foreclosure it is recited that the same was entered by the consent of the railroad company, John H. Allen, John Allen, Francis B. Cooley and James Buell, and of Humphreys, Jessup, Terry and Field.

Before the confirmation of this sale, Humphreys, Jessup, Terry and Field filed their exceptions to the payment of any and all indebtedness contracted by the receiver, except for necessary expenses in operating the road, and for supplies purchased since his appointment; and they especially objected to the payment of certain certificates under the order of the court, made May 6, 1878. After this, the sale was confirmed by order of the court.

The record shows that of the first mortgage coupons maturing on and after July 1, 1878, none were paid, and that of

those maturing on and after July 1, 1871 (embracing the coupons attached to bonds 13 to 25 inclusive), a portion only have been paid, leaving $227,278.87 unpaid. A rule was entered by the court on all the parties to show cause why distribution should not be made among holders of the bonds and coupons, and several claims of priority were interposed. Humphreys and his co-interveners claimed that the coupons held by them should be paid in the order of their maturity, before any distribution could be legally made on the principal sums specified in the bonds. It was insisted by the holders of coupons on which nothing had been paid, where the holders of other coupons of the same series and time of maturity were paid in full, that they should be equalized, and that the amount due upon such unpaid coupons should be paid in full before any part of the fund should be distributed upon coupons maturing later, or upon the principal sums secured by the bonds.

The court ordered that all the certificates issued by the receiver, mentioned above, be first paid; and the court denied the application of coupon holders for priority of payment, and ordered that the fund, after the payment of costs and receiver's certificates, be distributed *pro rata* to the holders of bonds and overdue coupons, treating all such claims, whether for principal or unpaid interest, as equal in law and equity. From this decree Humphreys, Jessup, Terry and Field, and some other holders of bonds and coupons, appealed to the Appellate Court for the Second District, where the decree was affirmed. From the judgment of the Appellate Court, Humphreys, Jessup, Terry and Field alone appealed to this court, and insist: first, that coupons overdue at the time when the principal of the bonds became due are entitled to priority of payment over the principal sums mentioned in the bonds, and in the order of their maturity; and second, that holders of bonds and coupons are entitled

to priority of payment out of the fund as against the holders of the receiver's certificates.

Mr. Wager Swayne, and Messrs. Hay, Greene & Littler, for the appellants, insisted it was error to allow the issue of receiver's certificates to pay claims for labor, supplies, etc., furnished the company within a period of six months before the appointment of a receiver, and also certificates with which to pay off an indebtedness for borrowed money, for which John Allen was personally responsible. The order of the court below established two classes of indebtedness as a first lien against the mortgaged property, amounting to about $150,000. The claims thus allowed a preference over the debt secured by the mortgage, were contracted years after the execution and recording of the mortgage. This displacement is not warranted by authority, and is subversive of the inviolability of contracts.

On the final hearing in chancery all interlocutory decrees are open for revision, and are under the control of the court. *Fitzhugh* v. *McPherson*, 9 Gill & J. 51; *Ridgley* v. *Bond*, 18 Md. 433; *Fanniquet* v. *Perkins*, 16 How. 82; *Consequa* v. *Fanning*, 3 Johns. Ch. 364; *Gibson* v. *Rees*, 50 Ill. 383.

A trustee can not charge the trust estate by his executory contracts, unless authorized to do so by the terms of the instrument creating the trust. *New* v. *Nicoll*, 73 N. Y. 130.

The person appointed receiver was disqualified from acting, being the senior officer of the company, and its largest creditor. *Baker et al.* v. *Admr. of Backus*, 32 Ill. 115; *Taylor* v. *Oldham*, Jacobs, 527; Kerr on Receivers, 126–130.

The receiver's authority was limited by the order of the court under which he acted, and all persons purchasing his certificates were bound to take notice of the extent of his authority. *Bank of Montreal* v. *C. C. and W. R. R. Co.* 48 Iowa, 524; *Stanton et al.* v. *Ala. and Chattanooga R. R. Co.* 2 Woods C. C.

32—101 Ill.

As to the application of the earnings of a railroad to current expenses, etc., see *Fosdick* v. *Schall,* 9 Otto, 252.

Messrs. WILEY & NEAL, for the appellees:

The order was interlocutory only, and not subject to review in a higher court until a final decision. *Woodside et al.* v. *Woodside et al.* 21 Ill. 207; *Gage* v. *Eich,* 56 id. 297; *Racine and Miss. R. R. Co.* v. *Farmers' Loan and Trust Co.* 70 id. 249.

Even if the decree was erroneous, the rights of third persons acquired under it are not divested by its reversal. *McLagan* v. *Brown,* 11 Ill. 519; *Clark* v. *Pinney,* 6 Cow. 297; *Hubbell* v. *Brownwell,* 8 Ohio, 120; *Goudy* v. *Hall,* 36 Ill. 319; *Feaston* v. *Fleming,* 56 id. 457; *Gray* v. *Brignardello,* 1 Wall. 634; *Gusteau* v. *Wisely,* 37 Ill. 433; *Wadhams et al.* v. *Gay,* 73 id. 415.

As to the power of a court of equity to appoint a managing receiver of a railroad company when taken under its charge as a trust fund to pay incumbrances, and to authorize such receiver to raise money necessary for the preservation and management of the property, and make the same chargeable as a lien thereon for its repayment, see *Wallace* v. *Loomis,* 7 Otto, 147; *Meyer et al.* v. *Johnston,* 53 Ala. 237; *Stanton et al.* v. *Alabama and Chattanooga R. R. Co.* 2 Woods C. C.; *Fosdick* v. *Schall,* 9 Otto, 235.

The bondholders were represented by their trustees, and must be regarded as bound by their acts, so far as the interests of third persons acting upon the faith of the action of the court, may be affected. *Wallace* v. *Loomis,* 7 Otto, 163; Jones on Railroad Securities, sec. 539.

Every railroad mortgagee, in accepting his security, impliedly agrees that the current debts, made in the ordinary course of business, shall be paid from the current receipts before he has any claim upon the income. *Fosdick* v. *Schall,* 9 Otto, 235.

Mr. WHEELER H. PECKHAM, for the appellees the Bank of New York, National Banking Association, and Union National Bank:

The petitioners have consented to the entry of the order giving the certificates priority over the bonds. Even if the consent of the trustees of the mortgage was not binding on the bondholders, it was necessary that those who repudiate it should do so promptly. Silence after knowledge is consent. *Gold Mining Co.* v. *National Bank,* 96 U. S. 640. Jones on Railroad Securities, secs. 363, 438.

A court of equity having the power to issue receiver's certificates and make them a prior lien, a purchaser of them is not bound to look into the proofs and judge their sufficiency. Should the adjudication of the court be afterwards reversed, intermediate purchasers would be protected. *Lovett* v. *Reformed Church,* 12 Barb. 67; *Ebaugh* v. *Church,* 3 E. D. Smith, 60 N. Y. Com. Pleas; *Wood* v. *Jackson,* 18 Wend. 107.

Mr. JUSTICE DICKEY delivered the opinion of the Court:

Whatever may be said as to the limitations which the law places upon the exercise of the power of the chancellor to make certificates issued by a receiver for moneys borrowed by him, a lien upon the property, superior to the vested lien of the mortgagees, in this case we think that appellants are not in a position to raise that question. The bonds which they held they bought from Mr. Constable on the 10th of May, 1879. At that time all of these certificates had been issued and disposed of by the receiver, and were held by the parties who had paid for them in cash, or had received them in substitution of securities which they held for preëxisting debts. Whether the subject matter to which these certificates were applied comes within the scope of the powers of the court in the preservation of the property for the benefit of all

concerned, was a question which might have been raised, and ought properly to have been raised, before the certificates were issued and sold. Mr. Constable, the owner of these bonds, knew, as a director in the railroad company, and by proceedings which occurred in the directors' meetings, that the road and other property of the company had been placed in the hands of a receiver. He knew that the order for the issue of certificates, to be made a first lien upon the property of the company, had been entered of record, and that such certificates were about to be issued and put upon the market. The proceeds of a part of these certificates were to be applied in releasing from a chattel mortgage property upon which the bondholders claim to have a lien, and in which he had an interest as a stockholder. It was incumbent upon him, if he intended to insist that these certificates should not be a paramount lien upon the property of the company, that he should have intervened and raised his objections. On the contrary, with a full knowledge of all the facts, he lay by and permitted others in good faith to invest their money in these certificates, and the money to be applied for his benefit in discharging the liabilities of the company for services and supplies, and for a debt by which the rolling stock of the company in which he was interested was tied up. In a court of equity he could not be heard afterwards to claim that the holders of these certificates should not have this priority.

The appellants purchased these bonds on the 10th of May, 1879, and the circumstances show that they knew that the bonds had become over due, and that they were advised of the condition of the litigation. The very language of the contract by which they purchased shows that they knew that the road was then in the hands of a receiver, and that the conduct of the business by the receiver was not satisfactory, and accordingly they were authorized to take measures to have the receiver changed. Under the circumstances they occupy no better position as holders of these bonds than did Mr. Con-

stable, whose mouth, we have seen, had been closed upon this subject by his own conduct.

The remaining question, relating to the priority claimed for holders of coupons first falling due, was disposed of, and by a majority of the court decided against the views of appellants, in the case of *Humphreys et al.* v. *Martin et al.* 100 Ill. 542, and need not be discussed here.

The judgment of the Appellate Court is therefore affirmed.

*Judgment affirmed.*

Mr. JUSTICE WALKER, dissenting:

It is seldom that a question of more importance is decided by this court than the one arising on this record, and inasmuch as I am unable to concur in the conclusion announced, and owing to the importance of the question as a precedent, I feel compelled to present some of the reasons for my dissent. In submitting them, I shall not content myself with merely criticising the views presented by the court, as it is not the opinion, but the decision, to which I dissent. All know that a decision may be strictly and accurately correct, and yet the reasons assigned in its support be fallacious. If I were able to demonstrate that the reasoning of the court is wrong, the correctness or incorrectness of the decision would remain unapproached,—that inquiry would still remain. The record presents some questions that are of first impression in this court, which I think must be determined before a correct conclusion can be reached. I shall endeavor to demonstrate that the decision of the court below is grossly erroneous.

I shall consider the questions whether the circuit court erred in borrowing the $149,431.51 on behalf of the railroad company or the fund, and had power to pledge the fund in court for its payment; whether it could make such indebtedness a superior lien to valid, unquestioned mortgage liens that appeared of record at and before the time the court borrowed that sum; and whether the court, before the final

order of distribution, should not have placed all of the first mortgage bondholders on an equality in the payment of interest.

Preliminary to the discussion of these questions, I shall refer to some of the plain, and, I think, well recognized, rules governing courts of chancery in administering such funds. The power to do so is an extraordinary one, and until a recent period has been seldom resorted to in practice. It is arbitrary, expensive, and generally resulting in heavy loss, and, not unfrequently, in ruin to the fund, and is oppressive, if not ruinous, to the parties. It may be a serious question whether its exercise has been productive of more benefit than evil; still, it is a well recognized part of equity jurisdiction. It has been of comparatively rare use in the State tribunals, but of more general use in the Federal courts. A practice has obtained in those courts that may not, and perhaps should not, be adopted by the State tribunals, and certainly not if not based on equitable principles, or is not promotive of justice. A proceeding so expensive, if not oppressive, to the parties, and the exercise of the power being almost wholly discretionary, the court should never exercise it except in cases of necessity, and not then unless it is clearly necessary to preserve the fund from waste or misappropriation; nor should the power ever be exercised to enforce mere legal claims. To call the power of the court into action there should be property, or a fund, in which several have equitable claims, or liens adverse in character and conflicting in interest. In modern times the power has usually been exerted to settle squabbles between partners in business, or to settle and adjust conflicting liens on corporate property; and in its exercise, I have no doubt, the power has been the subject of much and frequent abuse. It has been perverted even to the foreclosure of a simple mortgage, by placing the mortgaged premises in the hands of a receiver, when the rents and profits would not pay such an officer his fair charges for holding and

preserving the property, and this, too, when there was not the slightest reason for its exercise, because there was no danger of perversion or loss, and no conflicting equities. This is a manifest abuse of this dangerous power. Other abuses of the power seem to have obtained. It is perhaps more liable to be used as an engine of malice, or to procure fraudulent advantages, than any other power with ·which the chancellor is armed, and hence it should be more guardedly used.

Experience teaches, that when a partnership, by long and assiduous effort, has established a business and character more valuable than capital, it may be ruined and rendered totally worthless by a member· of the firm who, from petty jealousy or affront, invokes this extraordinary power. In such cases the entire capital of the firm is taken out of the hands of its owners, tied up in the custody of the law, lies idle for years, and its owners deprived of its use, prevented from continuing in business, and perhaps utterly ruined, and at the end of the strife, the court, too late, learns it was all prompted by spite and malice. With corporations it is believed not to be unfrequent that a portion of the directors and stockholders form designs to acquire the corporate control and property to the exclusion of the others, and resort to this proceeding to consummate their purposes. These matters are referred to as illustrating the almost certain ruin to parties, and the great danger of the courts being used as the unconscious instruments to effectuate unjustifiable schemes, and as admonishing them of the great necessity of using this discretion sparingly and with great caution.

When the court has seized the property and placed it in the hands of a receiver, it becomes the duty of the court, through that officer and by orders of the court, to use every reasonable effort for its preservation, and if on the final hearing it appears to be required, to decree its sale and reduction to money, and its speedy distribution amongst those entitled

to participate in the fund. One of its highest duties is the preservation of the property from all hazard and loss, and the fund from impairment and every kind of diminution. The court having deprived the owner of its care and custody, must use all reasonable efforts for its preservation; nor has the court the power to hazard either the fund, or its title, to loss. It must be held in the same condition, as to the rights of all parties, in its various changes, from its seizure till its distribution. The court has no right to change or modify the lien of any claimant, or in any manner jeopardize his legal or equitable rights, and all know the court can not do by indirection what it is powerless to do directly.

It is an egregious mistake to suppose that by seizing the property or fund the court or the receiver becomes its owner. The court is simply the legal custodian for its preservation and distribution, but invested with no title to, or interest in, the fund. The court, so to speak, is a mere naked bailee, charged with legal duties, but not invested with the slightest ownership of, or interest in, the property, beyond a mere right to, and the control of, its possession. All else are duties, and not rights. When the court seizes the property of a business firm or corporation, it does not become the firm or corporation, or invested with the powers or legal rights of either,—it simply becomes the legal custodian of the property. It does not necessarily have control over the partners of the firm, nor of the artificial person called a corporation; but it does become invested with the power to administer and distribute the fund, if required by the principles of equity. It then follows, that the court has no power to continue the business of the firm or corporation, or perform any act pertaining to either. If the members of the firm or the directors of the corporation have the means and the inclination, they, afterwards as before the seizure of their property, may continue their business. The firm may continue to carry out the purposes for which it was organized, and the corporate body

to perform all of its corporate duties and perform its various functions.

The placing of the property or fund in the hands of a receiver, is to all intents, and for all purposes, an equitable attachment; and who ever heard of a sheriff continuing the business of the defendant in an attachment or execution, after levying on his property? The law confers no such power, nor will it tolerate its exercise. Nor does the court become invested, by attaching the property, with any more power than the sheriff. The property in either case is in the hands of the law, to answer the requirements of the law, and not for corporate, manufacturing or business purposes.

From these considerations it is perfectly apparent that the court has no power to trade upon or with the property or fund in court, nor to borrow money on or pledge the fund as security for such loans, either to augment the fund or pay the debts of the owner; and the exercise of such power can find support in no rule, principle or analogy of the common law or equity jurisprudence, that I have in my researches been able to find, nor is it conferred by the statute, nor am I aware that it can rightfully come from any other source. But when actually necessary for the preservation of the property, the court has the power to order the sale of so much, and only so much, as may be required to preserve the balance. This grows out of the duty to preserve it; but if there is money as a part of the fund, or it can be collected from dues to the fund, it should be used for that purpose, and no property sold until ordered by the final decree. This is within the powers of the court. Railroad property being somewhat different in character from that of other corporations, and such corporations having been created, more largely than others, to subserve great public interests and needs, may admit of some slight exceptions to the general rule. No well founded objection is perceived to the court permitting the receiver, in holding and preserving the property of the com-

pany to answer the requirements of the law, to use it in operating the road, provided it does not impair or diminish the security of the lienholders, or increase the indebtedness of the company. In fact, I am unable to perceive how the court can constitute itself an agent of the company, and bind it by contracts never authorized or assented to by the company. When thus operated, all attendant expenses should be defrayed from earnings and receipts of the road.

But precedents are quoted from the Federal courts in support of the exercise of power to so operate the road, borrow money to meet such expenses, and even to furnish supplies, make repairs, and purchase rolling stock, and to pay incidental expenses, and make them a charge against the fund. But wrongly decided cases are not law, nor should they ever become binding precedents. In *Mittan's case,* 4 Coke, 33, it is said: "*Judicandum est legibus non exemplis.*" That was then, and has always since been, a maxim of the law. What possible reason can be assigned why judgments should not be given according to the laws, rather than precedents? Precedents may or may not speak the law, but all know that it is not always true that they do. A precedent that has stood the test of time, and has never produced any but beneficial results, is strong evidence that it speaks the law; but a decision hastily and inconsiderately made by a bold judge, determined to relieve against a supposed hardship in the particular case, without reflecting where it will lead, or the consequences that must ensue if adopted as a precedent, should never bind other tribunals. But the tendency is to throw the responsibility on the past, and to shield ourselves under the decision of others, and to blindly follow such, and all others, as precedents, without the labor and reflection necessary to determine their correctness or fallacy. By this means, many crude decisions get into the reports, confusion is produced, and wrongs perpetrated. Hence, it is the duty of the courts to enforce the law, and not precedents, unless they speak the

law. It has been truly said: "Precedents travel to enormous lengths." They are therefore required to be restrained and confined within the limits of the law.

But if it were possible to sustain, on legal or equitable principle, the power of the court to borrow money and make it a charge against the owner of the property, or a lien on the fund, it is impossible for me to see that it can, under any circumstances, or for any purpose, authorize the court to postpone legal, valid, unimpeachable liens on the fund, to secure the payment of debts that are not prior liens, or even liens at all, on the fund. How can it be that the court may arbitrarily override and trample upon vested rights, the obligation of contracts, and all of the safeguards the law has for ages built up and thrown around such rights? Ever since the organization of our government it has been supposed that when a person, in strict conformity to all the requirements of existing laws, obtains a right to property, or a lien upon it, there was no power in the State, its departments or functionaries, to deprive him of it, or to impair its force, or postpone it to subsequently acquired rights, without his consent, or some fault or omission of duty on his part. But here no one denies that appellants have such a lien, or claims they have omitted any duty, and yet their lien against the fund is postponed to the extent of $149,431.51 of debts created years after they acquired their lien.

Nor can this power, by any pretence, be legally exercised under the claim that this large sum was borrowed to be used for the preservation of the fund. That is contradicted by all of the evidence in the case. Under the circumstances of this case, it is a perversion, even an abuse, of terms, to claim this large sum was borrowed or used for such a purpose. It was borrowed to pay debts incurred by the company long subsequent to the mortgage liens, which debts were in nowise liens on this fund. This is the precise case, when stripped of all immaterial and extraneous circumstances.

The debts incurred in nowise contributed to the preservation of the fund. It but relieved the company, and not the fund, of indebtedness. All know the receiver could have safely held the property, and could have been paid for his labor, care, and necessary expenses in doing so, out of the proceeds arising from its sale. It seems to be a mere fiction to hold this large sum was raised to preserve the property, and had its preservation been necessary, there was not the slightest occasion to borrow the money.

Would not all men have been profoundly astonished had the circuit court decreed that the master in chancery should levy upon and sell a sufficient amount of the property of appellants to raise $149,431.51, and to apply it in payment of the debts that were discharged by the court? And in principle and law where is there a difference? Appellants were in nowise liable for the debts, and these were certainly, if any lien on the fund, in no sense superior, or to be preferred to theirs, unless it was the taxes on the property in the custody of the court. Then why should the court appropriate $149,431.51 of the fund on which they had a first lien, and deprive, or rather take from them, that many dollars to pay those debts? In what does or can it differ in principle from seizing one man's property to pay another man's debts, for which he is not in the slightest degree liable? It can not be denied that the court below took from the fund to which appellants, according to every known rule or principle of justice, were entitled, and paid it to creditors who had no claim to or interest in the fund or money thus taken. Appellants had no better or higher title to the money in their pockets than to their lien on this fund. No kind of sophistry or false reasoning can overcome this proposition.

. It, however, may be said that when a railroad is thus placed in the hands of a receiver great public interests are involved. This is no doubt true. And it is also urged that it behooves the courts to devise some means to protect those great inter-

ests.    It surely can not be the duty of the courts to despoil private individuals of hundreds of thousands of dollars of their fortunes to protect the public interest and convenience. It would seem to be far juster that the public, rather than appellants, should pay for the protection of such interests. Appellants only owe a common duty to the public, and if, as good citizens, they discharge that duty, the public has no further claim on them.    Then why take from them $149,431.51, and bestow it on the public?    There is nothing to show they have done any act that worked a forfeiture of this large sum of money, and if there was, this is not a proceeding for the purpose of enforcing it, or in which it could be declared and enforced.    If there be the supposed great public inconvenience, let the public provide for it by appropriate legislation, and even constitutional amendment, if needful, but let the courts refrain from visiting the consequences and the great burthen on a few private individuals.

For these, and other reasons I might adduce, I am unalterably convinced the circuit court was utterly powerless to borrow a dollar of money, or to pledge the fund for its payment, or to create any lien, and that it was absolutely without the semblance of power to divest appellants of their vested rights to their prior lien, and to do so was to destroy such rights, and to impair the obligation of a contract as valid and as solemnly entered into as any known to the law, and as fully entitled to legal protection as any right known to it.

I shall now consider whether the circuit court erred in making distribution of the fund.    No objection is perceived to paying the costs out of the general fund.    Such is the general practice in administering such funds.

Had the court possessed the power to create a lien, and had the decree made these sums a first lien on the personal property embraced in the chattel mortgage, then it might have been contended, under the authority of the cases of

*Gregg* v. *Sanford,* 24 Ill. 17, *Titus* v. *Mabee,* 25 id. 257, and *Hunt* v. *Bullock,* 23 id. 320, that the deeds of trust were not executed, acknowledged, registered and recorded in conformity to the Chattel Mortgage law, and were void as a chattel mortgage, and therefore never became a lien on the personal property; or it might have been claimed and shown that none of the personal property was in existence when the deeds of trust were given, and under the authority of 1 Parsons on Contracts, 437, and *Robinson* v. *McDowell,* 5 Maule & Selw. 228, the trust deeds did not attach to or become a lien on after-created or purchased personalty; but on the contrary, the decree declares the sums thus borrowed under its requirement, a lien on all of the property, and to be preferred to all other liens. Nor in the final order of distribution does the decree require these debts incurred by the court to be confined in their payment to the proceeds of the personal property. Had it done so, it is probable appellants would have had no right to complain, as they had, under these authorities, no lien on the personal property. Nor will I here stop to inquire whether appellants did not have, as lien creditors, an equal right to participate with the general creditors, including the holders of the second mortgage bonds, in the proceeds of the sale of the personal property, as there are other and abundant grounds for a reversal.

It may be said that there is nothing to show that there were not ample means arising from the sale of the personal property to pay these debts. We can not know that such proceeds amounted to more, if so much, as $1000. The court below should have, through the receiver, ascertained the amount for which it did sell, and have confined the participation of these debts to that fund alone, if it is possible to hold that they should be paid. In this there was clear and manifest error.

It is urged that appellants are estopped to deny that this $149,431.51 loan, under the order of the court, is not a lien

preferred to that of the two mortgages. The first ground of estoppel claimed is, that the trustees named in these mortgages were parties to the suit, and consented that this new indebtedness might become a preferred lien to that of the trust deeds, and that they should be postponed. The law is familiar, well settled, and I believe has never been questioned, that a trustee can never bind his *cestui que trust* by any act not within the scope of his authority. He is powerless to permit waste, or to destroy the trust property or fund, or to impair its title. Here the deeds of trust can not be so tortured as to confer a particle of power on the trustees to release or postpone the lien of the trust deeds to junior claims to those of the bondholders. Their power was to receive the money due the bondholders, or in default of payment, to sell the property and pay over the money, and their duty required them to preserve the fund and lien of their *cestuis que trust*. So far from having power to bind the bondholders, they were acting without authority, and in flagrant violation of their duty, and it would be monstrous injustice to hold the bondholders bound by their unauthorized act, performed in violation of their plain duty. It is true, they were the trustees for the bondholders, but the trust deeds conferred no such power, and the deeds were on record, and notice to all persons dealing with the trust fund. Had the parties making these loans under the decree of court, examined the records, they would have found the trust deeds had become liens years before, and the trustees had no power, at any time, for any purpose, or for any amount, to postpone these liens. The fact this was a fund in court, notified all persons that there were liens on the fund, otherwise the court could not have had the fund in its custody. Having such notice, those who loaned their money on this fund were guilty of gross negligence in failing to learn the nature and extent of the liens, before parting with their money.

It is next urged, that as the trustees were made parties to
the suit, the bondholders should be considered as parties,
and bound as though they had been in court. The position
is certainly novel, especially where we find the trustees,
instead of protecting the rights of the bondholders, en-
deavoring to release and depreciate their security. This
case strongly illustrates the necessity of having the bene-
ficiaries before the court, when their interests are involved.
Here the trustees endeavored to release to others over
$149,000 of the fund pledged to pay a debt of more than
double the value of the fund thus pledged. This demon-
strates the wisdom of the law requiring all parties in interest
to be before the court.

It is urged that the directors of the company, by resolu-
tion, authorized the $81,600 to be borrowed, and the per-
sonal property of the company to be mortgaged to secure its
payment, and the bondholders are thereby estopped, and it
thereby became a preferred lien to those of the trust deeds.
How, it may be asked, can a mortgagor, by executing a
second mortgage, and consenting or agreeing with the second
mortgagee to give him a preferred lien to that of the first
mortgagee, possibly change the rights of the first mortgagee?
Would not its maintenance violate the simplest principles of
the law, and every dictate of reason and plainest requirements
of common justice? If any of the directors were bondholders,
to the extent of their interest it would amount to a waiver of
their first lien on the property embraced in the chattel mort-
gage; but by no rule of which I am aware could it be held
to release or postpone their lien on other property, nor could
it affect the lien of any other bondholder. Allen swears that
at that meeting three-fourths of the bondholders were repre-
sented. The expression is indefinite, as he does not explain
in what manner they were represented. But even suppose
the directors then present held three-fourths of the bonds,
that could not, in the slighest degree, affect the rights of the

holders of the other fourth. To so hold would violate all known rules of law. The action of the board at that meeting did not impair or postpone the lien of holders of the fourth of the bonds not represented, or any property to which their lien had attached; but by the decree of the circuit court it was held it did, and in this there was gross and palpable error. All that can be justly claimed for that resolution is, that it postponed the lien of the bondholders then present, but only on the property embraced in the chattel mortgage, and nothing more, as already seen; but the circuit court held that it postponed the mortgage liens on all of the property. In this part of the decree there was gross error.

But it is said that appellants purchased their bonds *pendente lite,* and after the order for receiver's certificates to issue had been made, and they took in precisely the same condition Constable, from whom they purchased, held the bonds. This is no doubt true; but how did Constable hold the bonds? The court had made an order to borrow money without authority. It had, without authority, decreed such certificates should be a preferred lien to the first and second mortgage bonds. Nor did, as we have seen, the trustees, by betraying their trust, have any power to consent that the liens of the first and second mortgages should be postponed. This decree was reversible when, under our practice, it could be presented for review; and Constable not being a party to that decree, was not bound by it, and he not being bound, appellants could not be by purchasing of him. In this there is nothing that bears the remotest resemblance to an estoppel.

But counsel say Constable was a director, and owned the bonds now held by appellants, and voted to borrow the $81,600, and mortgage the personal property of the road to secure its payment; that he thereby postponed the lien of these bonds to that of the chattel mortgage, and appellants having afterwards purchased the bonds of him, took them with the same estoppel that prevented Constable from claim-

33—101 ILL.

ing these bonds were a prior lien to the chattel mortgage. To this proposition there are several conclusive answers: First, these bonds were not due, and there is no evidence that appellants had the slightest information that such a resolution was adopted by the directors, hence they were not bound by the resolution.

Again, the resolution can not, by any ingenuity, be tortured into anything more than a release of the lien of these bonds on the personal property to the extent of the sum of $81,600. As well say, a man, having a mortgage on two tracts of land, who releases or postpones his mortgage lien on one tract in favor of a junior lien, releases or postpones his lien on both tracts. The only possible effect of Constable's vote in favor of the resolution was to postpone any lien he held by his bonds on the personal property, but on nothing else. It is impossible to see how he, by voting for that resolution, could be held to have consented that the court should borrow $67,831.51 more, and make it a preferred lien on all of the property over all prior liens, or by what process of reasoning it can be said that his vote could postpone the lien of the bondholders under the second mortgage. Yet the decree does make both of these sums a preferred lien to all others, and ordered them to be first paid. Moreover, the decree authorizing the loan on the certificates was not supported by law, and was erroneous, and it can not be held that he, by that vote, intended to release all errors in all decrees that might be rendered in any suit that might thereafter be brought in reference to the mortgaged property; and if he had not released such errors, on what pretense can it be held appellants have released the error?

Again, complaint is made that to give appellants their just and legal rights will work great hardship on the holders of these certificates, especially as they relied on the decree of the court to give them a first lien. They were loaning money

created as can be done by the forms of the law.  These mortgages were on record, and they are conclusively presumed to have known the fact and all they contained, and they are presumed to have known the law, and if so, they must be held to have known that it did not sanction the decree, and that it was reversible.  The negligence, then, was theirs, and not that of Constable and appellants.  The court has no power to deprive parties of their just, legal and equitable rights, and confer them on others merely to relieve against hardships.  To do so would abolish the administration of justice according to law.

But conceding that the court had the power to direct the receiver to issue certificates, and borrow this money to relieve the personal property from the chattel mortgage and other liens, and to pay debts, etc., it was manifest error not to have confined the payment of the certificates exclusively to that property and its proceeds.  But I hold the court had no power to order the borrowing of money, or to make it a lien on this or any other property.  I further hold courts are not, nor can the law permit them to become, money changers, and borrow and loan money, buy and sell commercial paper, and transact a general brokerage business.  It may be said this is not of that character of business.  If the court may borrow money because it conceives it to be for the interest of the parties litigant, why not, for the same supposed reason, loan their money for profit, buy their paper, or that of other parties, at a discount, thus advancing their interest, and thus take its litigants under its paternal care?  If it may borrow money, it is but a short step to all of the other acts, and they can be justified on precisely the same grounds and for the same reasons.  Far better leave it to the legislature, in whose province the power is found, to afford a remedy, if needed.  The courts are not invested with such corrective legislative power.

If it be urged that appellants should have resisted the decree of the court requiring the receiver to borrow the money and issue his certificates, it may be asked how they could resist, as they were not parties when the decree was passed, nor does it appear they had the slightest notice of the proceeding. Then, on what principle hold them estopped from asserting their rights? It has generally been understood that a man can not be estopped unless he is fully informed of the facts, and assents, or fails to protect his rights, to the injury of others; and the never-questioned doctrine is, that no person can be bound by a judgment or decree unless he is a party to the proceeding, and has opportunity to assert his rights, or he claims in privity with one who has had such opportunity. If appellants must be held estopped because they failed to appear and resist the order, under the circumstances of this case, it must be upon some rule of which I have no knowledge, nor can such a rule be shown. Shall we deliberately hold that a person having a lien on, or having an interest in, property or a fund, shall be deprived of his unquestioned and unassailable rights in it because he fails to appear and defend them when involved in a suit to which he is not a party, and this, too, when he has been guilty of no wrong, or the omission of any duty? Is it possible to maintain such a doctrine without overturning principles that have not been questioned for ages, or perhaps are so simple and eminently just that they never were questioned? No rule ever announced requires a person having such a lien to seek all persons and inform them of the fact. The recording law does that for him.

Again, in making distribution the circuit court refused to first satisfy unpaid coupons for interest, when other coupons of the same series had been paid, and thus equalize all bondholders in the amount of interest received, before making the general distribution. In cases of this character equality is equity. A portion of the bondholders had received payment

of installments of interest, when others had received no interest on these installments. In this manner some of the bondholders received more than a *pro rata* share of the fund. Each bondholder had an equal right in equity to share in the fund. The fund was inadequate to pay the full amount of the first mortgage bonds, and no principle of equity is clearer than in such a case all have equal equities, and are entitled on its distribution to share in it *pro rata.* As the fund was distributed, a part of the bondholders received of the fund more than their proportionate share, and this was manifest error. The trust was created to secure all of the bondholders of the same class alike, and each one had an equal lien on the same fund to secure his bonds and interest, and when the fund proved insufficient to pay all, it is incomprehensible how one portion of the bondholders, having no superior equities, should receive of the fund more than their *pro rata* share in the distribution.

I have, I think, shown that beyond all doubt the decree of the circuit court is manifestly erroneous, and should be reversed. Were not my convictions so thorough that this decision is wrong, I should not have troubled the profession with these hastily constructed views, and had my official duties permitted, I should have given more thought and reflection, and presented other reasons, for my dissent; but the importance of the questions seemed to call for my adverse views before the case becomes a precedent.